Case No. 26-572

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**In re: DEFENDERS OF WILDLIFE,**

*Plaintiff/Appellants,*

v.

**DOUG BURGUM**, in his official capacity as Secretary of the U.S. Department of the Interior; **BRIAN NESVIK**, in his official capacity as the Director of the U.S. Fish and Wildlife Service; **KING COVE CORPORATION**, an Alaska Native Village Corporation; and **RYAN ANDERSON**, in his official capacity as the Commissioner of the Alaska Department of Transportation and Public Facilities,

*Defendant/Appellees*

On Appeal from the United States District Court for the District of Alaska,
Case No. 3:26-cv-00298-ACP Hon. Aaron Christian Peterson, District Judge

# DEFENDANT APPELLEE KING COVE CORPORATION'S OPPOSITION TO PLAINTIFF/APPELLANTS' MOTION FOR INJUNCTION PENDING APPEAL

**JAMES F. CLARK**
LAW OFFICE OF JAMES F. CLARK
1109 C Street Juneau, AK 99801
(907) 723-6952 (office)
jfclarkiii@gmail.com
Alaska Bar #6907025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ............................................ **Error! Bookmark not defined.**

II. BACKGROUND ..........................................................................................2

III. SUMMARY OF ARGUMENT .................................................................. 4

IV. STANDARD OF REVIEW ........................................................................ 6

V ARGUMENT ...............................................................................................6

A. Introduction ........................................................................................ 6

B. Did Plaintiff Raise Serious Questions Going to the Merits? ................ 7

1. Will use of the 2.8-Mile, One-lane Gravel Road on KCC's Private Land Facilitatae Increased ATV use on the Refuge? ........... 7

2. Did Appellant Raise a Serious Question Regaradding an Unexplained Change in the Agency Position? ................................11

3. Does the Road on KCC Land Extending Toward the Wilderness Boundary Adversely Impact the Character of the Wilderness? ......................................................................13

4. Conclusion Appellant did not Raise a Serious Question Going to the Merits.........................................................................14

C. Did Appellant Show that it is Likely to Suffer Irreparable Harm? ........14

1. Introduction ...........................................................................................14

2. Plaintiff and its Members have No Rights on KCC's Private Land .........................................................................................14

3. A Question of Appellant's Standing ....................16

D. The Balance of Hardship Does Not Tip Toward Appellant....................21

1. Balance of Hardships as Determined by the Court ....................21

2. The Balance of Hardships Favors KCC ....................23

CONCLUSION ....................24

CERTIFICATE OF COMPLIANCE ....................25

CERTIFICATE OF SERVICE....................25

# TABLE OF AUTHORITIES

Cases

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 11127, 1
131 9th Cir. 2011)........................................................................6, 8

*FCC v Fox Television Stations Inc.,* 556 U.S. 502, 515 (2009) .....................8

*National Audubon Society v. Hodel*, 606 F. Supp. 825 (D. Alaska 1984)......3

*National Park Service, et al. v. National Trust For Historic Preservation In The United States*, 609 U.S. *Cite*___, (2026)..........................................5, 17

*Organized Village of Kake v. Department of Agriculture*, 795 F. 3d 956, 969 (9th Cir. 2015) ...........................................................................11

*Sierra Club v. Hickel*, 467 F.2d 1048 (6th Cir. 1972)...................................3

*Summers v. Earth Island Institute*, 555 U.S. 488, 495-496 (2009)...............20

*Winter v. Nat. R. Def. Council Inc.*, 555 U.S. 7, 20 (2008)............................5

Statutes

43 U.S.C. § 1601 (a) ........................................................................*Passim*

Regulations

50 C.F.R § 25.21(b)(1)(iii). ..................................................................... 7

Other Authorities

Alaska National Interest Land Conservation Act (ANILCA) ........................Passim

## I. INTRODUCTION

The District Court correctly determined that Appellant's Emergency Motion for an Injunction Pending Appeal (hereinafter "Appellants' Motion) made below on substantially the same points as here is without merit. Dkt. 34 Case No. 3-26-cv-00298 ACP. Appellant complains that it will suffer irreparable harm from the All-Terrain Vehicle (ATV) and Off-Road Vehicle (ORV) (hereinafter collectively called "ATV") traffic that will be unleashed on the Refuge and Wilderness as a consequence of the 2.8-mile road to be constructed for better access to subsistence resources on what has been King Cove Corporation's (KCC's) private land since 1990. As the District Court found, Appellant and its members are not likely to suffer imminent or irreparable harm during the 2026 construction season because there will be State-required controls on ATV traffic during construction for safety reasons which will prevent the harm which Appellant suggests. Dkt. 34, Case No. 3-26-cv-00298 ACP page 4.

Moreover, Appellant lacks standing to bring this case to enjoin construction of the 2.8-mile road on KCC's private land based on its reason for bringing this action – namely, that the 2.8-mile road will tie into a potential future road from King Cove to Cold Bay.[1] Because ATV traffic will be controlled during this Project's

[1] On the very first page of its Brief Appellant states the reason for its Motion: "The KCC Segment is intended to connect an existing road between King Cove and the Northeast Hovercraft Terminal to a right of way corridor through Izembek Refuge and Wilderness ("Exchange Segment"), conveyed to KCC via land exchange in 2025

2026 construction, there will be no harm to the Refuge and Wilderness from the 2.8-mile road during construction. (On the other hand, because the 2.8-mile road has the independent utility of providing better, more environmentally friendly, access to subsistence resources, KCC will be harmed if the road is not constructed). Because the proposed road from the end of the 2.8-mile segment on KCC's land to Cold Bay has been vacated, litigation to prevent construction of the 2.8-mile segment on KCC land would not redress Appellant's main concern. So, because there is time to litigate Appellant's standing and other issues regarding the 2.8-miles of road on KCC land over the winter, Plaintiff does not qualify for an injunction.

## II. BACKGROUND

Congress found in 43 U.S.C. § 1601 (a) of the Alaska Native Claims Settlement Act of 1971 (ANCSA) that "there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." Moreover, ANCSA § 1601 (b) provided that "the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property."

---

as part of a planned road to connect King Cove to Cold Bay. District Judge Sharon Gleason recently vacated the 2025 land exchange for violating multiple laws, *Native Vill. of Hooper Bay v. Burgum,* 2026 WL 2409781 (D. Alaska Aug. 18, 2026), foreclosing construction of the Exchange Segment for now. Appellant's Motion at 1.

The Aleut people had populated the area, including what became the Izembek National Wildlife Refuge for thousands of years before § 303 of the Alaska National Interest Land Conservation Act (ANILCA) redesignated it the Izembek National Wildlife Refuge in 1980. In recognition of their long use and inhabitation of the land, Congress designated preserving Natives' and other rural residents' subsistence way of life as one of the purposes of ANILCA (§ 101 (c)). (Kochuten Declaration at ¶ 16).

ANILCA § 101 (b) provides a subsistence purpose of ANILCA that supports preservation of the subsistence way of life on private land that was patented to King Cove Corporation (KCC) in the Izembek National Wildlife Refuge in 1990. (Kochuten Declaration at ¶ 5).

As discussed below, a major purpose of the 2.8-mile road planned for construction on KCC's land is to improve access to subsistence resources and to consolidate All Terrain Vehicle (ATV) traffic on that road (Kochuten Declaration at ¶12). This purpose marries maintenance of the subsistence way of life with the conservation purposes of ANILCA §§ 101 (c) and (b).

The conservation purpose also applies to KCC through the compatibility requirement of 43 U.S.C. § 1621 (g) set out as a deed restriction in its 1990 patent:

> Notwithstanding any other provision of this chapter, every patent issued by the Secretary pursuant to this chapter—which covers lands lying within the boundaries of a National Wildlife Refuge on December 18,

> 1971, shall contain a provision that such lands remain subject to the laws and regulations governing use and development of such Refuge.

KCC agrees with Federal Defendants Dkt. 33 and *Sierra Club v. Hickel*, 467 F.2d 1048 (6th Cir. 1972), *cert.* denied, 411 U.S. 920 (1973)[2] that managing such deed restriction issues on private land in Refuges should be left to the discretion of the Secretary and not be reviewable. Though thinking may have changed,[3] the Secretary must at least be afforded sufficient discretion to decide whether a 2.8-mile road having the independent purpose of achieving better access to subsistence resources on KCC's private land is compatible with the fish and wildlife resources on the remaining 315,000-acre Refuge. Because ATV access to subsistence resources is allowed on National Wildlife Refuges in Alaska (50 CFR § 36.12), the road will provide a more environmentally friendly, hardened channel for rural residents to gain such access.

## III. SUMMARY OF ARGUMENT

For the reasons described below KCC asks the Court to deny Appellant's Motion for an Injunction Pending Appeal. That Motion presents speculative

[2] Federal Defendants argue that the Compatibility Determination is not a prerequisite to construction on KCC's private property and that the APA does not authorize an injunction against nonfederal actors building on private land. (Dkt. 18 at 10-14). See also the Declaration of Karlin Itchoak, Assistant Regional Director, National Wildlife Refuge System, of the Alaska Region of the U.S. Fish and Wildlife Service (Service) in the U.S. Department of the Interior Dkt. 18-16 at ¶ 6: "I am not aware of the Service taking any action to try to stop an activity on privately-owned lands subject to the ANCSA section 22(g) restrictions."

[3] *National Audubon Society v. Hodel*, 606 F. Supp. 825 (D. Alaska 1984).

concerns that the impacts from a 2.8-mile, 13' gravel road constructed on KCC's private land during 2026 (*i.e.*, increased unlawful ATV activity)[4] could ***potentially*** impact Refuge land which is distant from the Project's terminus. Because Appellant has no rights or standing to stop development on KCC's private land and has described no likely, imminent impacts upon the Refuge from the 2.8 miles of construction on KCC land, Appellant has not presented concrete injuries on which Appellant is ***likely*** to prevail on the merits.[5]

Moreover, Appellant will not suffer harm, irreparable or otherwise from construction of the 2.8-mile road during what remains of the 2026 construction season. Appellant claims that "the KCC [2.8-mile] Segment is likely to increase illegal ATV encroachment into ad jacent refuge wilderness land, irreparably harming Appellant's protected interests." Appellant's Brief Dkt. 8.1 at page 13. As the Court below found at Dkt. 34, page 4, "starting construction will trigger the use of safety measures, like barricades, which are specifically designed to prevent 'to prevent unauthorized access' to areas near the construction zone." (See also, State of Alaska Brief at Dkt 31, pages 4 – 6; and Lowell Declaration Dkt. 31-1 at ¶¶ 3-4).

---

[4] See District Court's Order, Dkt. 34 Case No. 3-26-cv-00298 ACP at pages 4-5.

[5] Based on the strikingly similar fact pattern of the instant case with the facts and posture of the plaintiff in the United States Supreme Court Opinion in *National Park Service, et al. v. National Trust For Historic Preservation In The United States*, 609 U.S *Cite*___, (2026) (released on Monday, August 31, 2026), KCC contends that Appellant lacks standing to bring this case on the 2.8-mile road segment on KCC's private land. The argument is made at pages 11-14 of this brief because the material in this brief that precedes those pages explains the facts explaining why this case is so similar to the *Historic Preservation* case.

It follows that if the activity on KCC's private land that Appellant claims will adversely affect its interest on distant land will not occur, then the claimed harm to the distant land will not occur during the period covered by Appellant's Motion for an Injunction pending appeal. Nor will such irreparable harm occur thereafter because the 2.8-mile road will provide a hardened surface for the small amount of ATV traffic there is, which will keep it from making tracks in the fields.[6]

## IV. STANDARD OF REVIEW

The requirements for obtaining the extraordinary remedy of an injunction pending appeal were specified in *Winter v. Nat. R. Def. Council Inc*., 555 U.S. 7, 20 (2008). A party must show that: 1) it is ***likely***[7] to succeed on the merits; 2) it will suffer irreparable harm if the injunction is not granted; 3) the balance of equities favors an injunction; and 4) an injunction will serve the public interest.

> Because the Ninth Circuit may also apply these factors on a sliding scale, "serious questions going to the merits" and a balance of hardships tipping sharply toward the plaintiff can support an injunction if the remaining *Winter* factors are met.[8] This does not change the requirement that irreparable harm must still be ***likely,*** not ***merely***

[6] "The State intends to use the subsistence access re-route to reduce the number of tertiary trails in the region by consolidating ORV use onto a modern roadbed, designed and constructed to comply with all environmental laws; to provide King Cove residents a more direct and easier alternate pathway, thereby reducing the dispersed impact of tertiary travel.
AKDOT has successful experience from the design and construction of a similar centralized pathway to concentrate ORV use in its evacuation road construction in Gambell, Alaska."
See Dkt. 17 at page 11.

[7] The irreparable harm must be ***likely*** - not speculative or merely possible. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 11127, 1131 9th Cir. 2011).

[8] *Id*. at 1135,

***possible***.[9] The public interest is considered at the same time as the balance of hardships when the Government is a party. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

## IV. ARGUMENT

### A. Introduction.

The District Court correctly found that Appellant does not qualify for injunctive relief:

> DOW [Defenders of Wildlife] has not shown that it is likely to prevail on its arguments concerning the Service's consideration of Refuge purposes or its alleged change in agency position. The Court assumes without deciding that DOW made a sufficient showing about the Service's treatment of Izembek's wilderness purpose on the merits. But that is not enough because DOW has not shown that irreparable harm to its members is likely before the merits can be resolved. Nor has it shown that the balance of hardships tips in its favor. Dkt. 24 Case No. 3-26-cv-00298 ACP at page 2.

### B. Did Plaintiff Raise Serious Questions Going to the Merits?

1. Will Use of the 2.8-Mile, One-Lane, Gravel Road on KCC's Private Land Facilitate Increased ATV Use on the Refuge?

For openers, as the District Court recognized, the test is whether the impacts from actions taken on KCC's private land will prevent the adjacent Refuge from achieving its purposes, not on the effects of such actions on KCC's private land. 50 C.F.R § 25.21(b)(1)(iii). Dkt. 24 at Case No. 3-26-cv-00298 ACP at page 7. At first blush one must ask: "If the Army using it as an artillery range  and soldiers driving

[9] *Id*. at 1131.

jeeps throughout it to hunt and fish and during World War II through the 1950s did not prevent 315,000 acres of it from becoming a Wildlife Refuge with a 300,000 acre portion designated a Wilderness Area 'untrammeled by man;' how could a 2.8-mile, single-lane, gravel road on KCC private land intended: a) to provide improved access to subsistence resources (consistent with ANILCA § 101(c)'s purpose of supporting rural residents way of life) and b) to consolidate ATV traffic on KCC land to a hardened surface from land surrounding the proposed road "prevent the adjacent Refuge from achieving its purposes?"

To be sure Appellant correctly states that "this Court acknowledges that 'there is ***some*** evidence supporting Defenders of Wildlife's (DOW's) concern' about the KCC Segment's facilitation of increased motorized access and that '[r]easonable people can disagree about which prediction will prove correct.'" Order Dkt. 24 Case No. 3-26-cv-00298 ACP at pages 9–10. (Emphasis added). But is "***some*** evidence" the same as "serious questions going to the merits?" Or is "some evidence" the same as "***likely*** - not speculative or merely possible" harm? *All. for the Wild Rockies v. Cottrell*, 632 F.3d 11127, 1131 9th Cir. 2011). The District Court assumed so without deciding. It was unnecessary to decide because the District Court determined that: "DOW has not shown that irreparable harm to its members is likely before the merits can be resolved. Nor has it shown that the balance of hardships tips in its favor." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 2.

Importantly, the District Court recognized that both the Compatibility Determination and the State "acknowledged the possibility of additional unauthorized routes and reasoned that a hardened road "may reduce some of the dispersed trails because the road will be easier to navigate." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 10.[10] The Court concluded that: "The Service appears to have done exactly what the law requires here: identified the problem, considered relevant information, and explained why it did not believe the impacts attributed to this use would materially interfere with Izembek's purposes." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 10. The Court summed up: "The governing question was whether the proposed use would materially in interfere with fulfillment of Izembek's purposes. On the present record, DOW has not shown that the Service likely acted arbitrarily in answering the question." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at pages 10-11.

Appellant contends that it is "irrelevant whether the KCC Segment might concentrate ATV use *on KCC 22(g) lands.* Any such consolidation will not protect refuge wilderness *adjacent to* KCC's 22(g) lands from ATV encroachment." Appellant's Brief Dkt. 8.1 at page 16. Accordingly, Appellant refers to the

---

[10] The State supported this finding by stating its intent to "use the subsistence access re-route to reduce the number of tertiary trails in the region by consolidating ORV use into a modern Rd. bed, designed and constructed to comply with all environmental laws; To provide king Cove residents a more direct and easier alternative pathway, thereby reducing the dispersed impact of tertiary travel." Dkt. 17 at page 11.

Biological Opinion accompanying the Compatibility Determination and dismisses consolidation as "harm reduction." *Id.*

The foregoing is an illustration of the District Court and Appellant placing different weights on the evidence. Due to the Peter Pan Seafood Plant closure the population of King Cove is half what it was when the 2022 study to which Appellant refers was conducted. So, there are far fewer King Cove subsistence users. Moreover, traditional ATV use for subsistence purposes by local rural residents as a "means of surface transportation traditionally employed" is allowed by ANILCA § 811 in National Wildlife Refuge Wilderness Areas in Alaska.[11]

So, Appellant is wrong in insinuating that protecting Refuge Wilderness for its members "aesthetic, professional, recreational, scientific, economic, and other interests in Izembek's wildlife, habitats, and wilderness values" (Appellant's Brief Dkt. 8.1 at pages 14-15) is more important than protecting the ANILCA-protected right of local rural residents to use ATVs to access the Refuge Wilderness for subsistence purposes. The District Court had to consider that ATV use for subsistence purposes in Wilderness areas is allowed to protect "rural residents engaged in a subsistence way of life to continue to do so" (which is a purpose of

[11] This authority is implemented through 50 CFR 36.12(a), which explicitly permits certain motorized access for subsistence by local rural residents in Alaska Refuges, including designated Wilderness. The ATV must be used for subsistence access, must be "traditional" or necessary for subsistence, and must not cause significant restriction or degradation of wilderness values. Such use is also subject to Refuge Manager restrictions.

ANILCA. See § 101 (c)). The District Court had to consider that because Congress allowed ATV use in the Refuge Wilderness areas Congress had to realize that such use would have a physical impact on the Refuge and the Wilderness.

Accordingly, the District Court could weigh the evidence and reasonably conclude that consolidation and the Service's plans to mitigate the impacts of off-road ATV usage within the Refuge by education, partnerships, and enforcement, (Dkt. 8-1 at 11), both protected King Cove residents' subsistence rights and prevented irreparable harm to Appellant and its members.

2. Did Appellant Raise a Serious Question Regarding an Unexplained Change in the Agency Position?

Appellant claims that the Service reversed decades of factual findings about the environmental consequences of a road through Izembek in violation of *FCC v Fox Television Stations Inc.,* 556 U.S. 502, 515 (2009) and *Organized Village of Kake v. Department of Agriculture*, 795 F. 3d 956, 969 (9th Cir. 2015) which requires an agency changing an existing position to acknowledge the change and provide a reasoned explanation for it. (Appellant's Brief Dkt. 8.1 at pages 23-24)

The District Court disagreed. It compared the Service's 2026 Compatibility Determination with another done in 2003 that concerned a larger project – *i.e.*, the whole road. The District Court also found that: "[R]ather than disregard the findings, the Secretary concluded that the earlier decisions did not properly balance the economic and social needs of the native and non-native people of Alaska. Dkt. 20 at

30, 38). That kind of policy reevaluation is allowed under *Fox, See Kake, 795* F.3d at 968." Accordingly, the District Court determined that Appellant's theory is without merit and does not show a likelihood of success on the merits. Order Dkt. 24 Case No. 3:26-cv-00298 ACP at page 14.

Appellant complains that the District Court failed to consider the fact that the 2003 Compatibility Determination did not analyze a road leading up to the wilderness boundary while the 2026 Compatibility Determination did. Appellant's Brief Dkt. 8.1 at pages 24. Appellant does not explain why that would make a difference given that ATV use for subsistence purposes in Wilderness areas is allowed to protect "rural residents engaged in a subsistence way of life to continue to do so" (which is a purpose of ANILCA. See § 101 (c)).

Appellant again disagrees with the District Court's finding that the 2025 Exchange Decision provided an adequate Explanation of Interior's change in position. *Id.* But, as Appellant acknowledges, *Id.* Judge Gleason agreed with the District Court that the Land Exchange provided an adequate explanation for Interior's change in position[12] even though her Decision did not explicitly address

[12] "The Court finds that the Secretary displayed full awareness that he was changing the agency's position by relying not only on the conservation and subsistence purposes of ANILCA, but also its purpose of addressing the economic and social needs of the State and its citizens; that, as explained above, the Secretary's consideration of this additional purpose is permissible under ANILCA; that the Secretary believed the Exchange is a better policy; and that the Secretary has provided good reasons for the new policy and a reasoned explanation for his factual findings and his disagreement with the prior contradictory findings.206

the Compatibility Determination. The District Court reasonably relied upon Judge Gleason's broad finding in determining that the Secretary's policy re-evaluation satisfied *Fox* and *Kake*.

3. Does the Road on KCC Land Extending Toward the Wilderness Boundary Adversely Impact the Character of the Wilderness?

The District Court correctly points out that the planned road on KCC's private land (which is outside the Wilderness) "extends toward the Wilderness boundary." Order Dkt. 24 at page 14. Because traditional ATV use for subsistence purposes by local rural residents is allowed in National Wildlife Refuge Wilderness Areas in Alaska by ANILCA § 811 and 50 C.F.R.§ 36.12 (a), there surely is no prohibition on Native land being adjacent to Wilderness Areas.

In any event KCC's land selection was submitted in the 1970s prior to ANILCA designating the area as Wilderness in 1980. (Kochuten Declaration at ¶ 14). The Service's Compatibility Determination recognized the potential for noise impacts and unauthorized motorized use "but concluded that those effects would be limited and would not materially interfere with the Wilderness purpose." Dkt. 8-1 at 15-16. Importantly, the Service plans to mitigate the impacts of off-road ATV usage within the Refuge by education, partnerships, and enforcement. Dkt. 8-1 at 11.

---

Accordingly, the Secretary did not violate the APA when he changed the agency's position in approving the Exchange." Dkt. 51, Case No. 3:26-cv-00319 SLG

It follows that some physical impact of traditional ATV use for subsistence purposes was contemplated by Congress when it enacted ANILCA § 811. The character of the Wilderness will be no less lawful or different than Congress contemplated or than it was before being officially designated as Wilderness in 1980 even if the road on KCC's land extends to the Wilderness boundary.

4. Conclusion Appellant Did Not Raise a Serious Question Going to the Merits.

While Appellant has raised questions going to the Merits it is arguable how "serious" they are. The District Court correctly determined that the most serious concern is the interaction between protecting Wilderness purposes and ANILCA § 101(c)'s purpose of protecting the rural way of life. The District Court correctly observed that: "Regardless, even assuming [Plaintiff] has made a sufficient showing about the strength of its Wilderness Act argument, the remaining *Winter* requirements still apply. And those requirements resolve the motion." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 15.

**C. Did Appellant Show that it is Likely to Suffer Irreparable Harm?**

1. Introduction.

The District Court answered the above question as follows:

> [Plaintiff] must show irreparable harm that is likely before the merits can be resolved. *Winter*, 555 U.S. at 22. Speculative injury is not enough. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988). Environmental injuries can be especially difficult to

> repair after the fact, but that does not mean that "'any potential environmental injury' warrants an injunction." *All. for the Wild Rockies*, 632 F.3d at 1135 (internal citation omitted). Order Dkt. 24 at page 16.

2. Plaintiff and its Members have No Rights on KCC's Private Land.

The District Court found that:

> DOW's members describe substantial interests in visiting, recreating in, guiding in, viewing wildlife in, and preserving Izembek Refuge and Wilderness. (Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 16. (Dkt. 8-14 at 23; Dkt. 8-15 at 13-18) They do not claim comparable use of the private KCC property where construction will occur. (*See id*.) **So permanent alteration of that property is not itself the irreparable injury on which they can rely. There must be a likely connection between construction on KCC land and injury to the adjacent Refuge or Wilderness interests its members *actually* use. *Id.*** (Emphasis added).

The District Court thus limited the "likely connection" inquiry to the then 2.8-miles of road planned to be built on KCC land – not the entire 18.9-mile road vacated by Judge Gleason's Order on August 18th. The District Court then observed that: "[t]he relevant question is whether [Plaintiff] has shown that this 2.8-mile segment is likely, during the comparatively short period before merits review, to produce the additional damaging refuge and wilderness use on which its irreparable harm theory depends. It has not." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 18.

In reaching this above-quoted conclusion the District Court pointed to the countervailing evidence presented by the State that "one objective of the project is

to consolidate travel onto a stable route." Dkt. 17-8 at 5-6. While Appellant disputes this, Appellant bears the burden of showing likely irreparable harm." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 18.

From this the Court concluded: "[Plaintiff] may be able to demonstrate an environmental concern about motorized access associated with the completed Izembek road. But it has not shown that construction and use of the KCC [ 2.8-mile] segment alone will likely cause irreparable injury to its members interest in adjacent federal lands before this case can be decided." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at pages 18-19.

3. A Question of Appellant's Standing.

To satisfy Article III's standing requirement, Appellant must show that (1) it has suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to Appellees' challenged action; and (3) it is likely, rather than merely speculative, that a favorable decision in this case will redress the injury. *Summers v. Earth Island Inst.,* 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).

The District Court correctly framed the "fairly traceable" question of Appellant's standing: "There must be a likely connection between construction on KCC land and injury to the adjacent Refuge or Wilderness interests its members actually use." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 16. Put another

way, will the 2.8 miles of construction on KCC land during 2026 cause an interference with Appellants' members claimed interests in "visiting, recreating in, guiding in, viewing wildlife in, and preserving Izembek Refuge and Wilderness" (Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 16) in 2026 before the Ninth Court can decide the case? Appellant has the burden of proof on this question but have not claimed that its members will "visit, recreate, guide, and view wildlife" during the period of construction or even what remains of 2026. Even if such a claim were made Appellant has not shown how such construction would interfere with their visiting, recreating, guiding, and viewing wildlife. It is all *speculative*, not *likely*. Moreover, Appellant's real concern is that it will tie into a potential future road to Cold Bay:

> The KCC Segment is intended to connect an existing road between King Cove and the Northeast Hovercraft Terminal to a right of way corridor through Izembek Refuge and Wilderness ("Exchange Segment"), conveyed to KCC via land exchange in 2025 as part of a planned road to connect King Cove to Cold Bay. District Judge Sharon Gleason recently vacated the 2025 land exchange for violating multiple laws, Native Vill. of Hooper Bay v. Burgum, 2026 WL 2409781 (D. Alaska Aug. 18, 2026),
>
> Appellant's Brief at page 1, Dkt. 8.1.

The Appellant here is in a position akin to the Plaintiffs' position in *National Park Service, et al. v. National Trust For Historic Preservation In The United States*, 609 U.S. *Cite*__, which was decided on August 31, 2026, on the Historic Preservation Plaintiff's application for a Stay. Like the Appellants there, the

Appellant here does not use or have any rights to KCC's private land from which the alleged harmful conduct is occurring. (Kochuten Declaration at ¶ 10). Like the Appellants there, the District Court has determined that the Appellant here has not shown irreparable injury to its members' interest in the federal land due to the road construction on KCC's private land "before the merits can be decided" over the winter. Order Dkt. 24 at page 22. Accordingly, like the Appellants there, the Appellant here does not have standing:

> To establish its standing to bring this case, the Trust relies on a declaration from a single of its members, Alison K. Hoagland. Hoagland says that she lives in Washington, D. C., and expects to visit the neighborhood around the White House "about once a month." App. to Application 73a–74a. She asserts that having to view the finished ballroom the government is constructing would cause her to suffer "injuries" to her "aesthetic, cultural, and historical interests" because she finds the "scale," "height," and "massing" of the government's design distasteful. *Id*., at 75a. On the strength of that declaration, the Trust contends, it has Article III standing to challenge the East Wing project.
>
> This Court has not found standing in circumstances like these before. To the contrary, we have repeatedly held that mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III. As we have put it, "this Court has long made clear that distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit." *FDA v. Alliance for Hippocratic Medicine*, 602 U. S. 367, 390, n. 3 (2024). Instead, to secure standing a plaintiff must identify some concrete and particularized injury "other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 485 (1982); see also *Schlesinger v. Reservists Comm. to Stop the War,* 418 U. S. 208, 227 (1974) (rejecting "the idea that generalized citizen

> interest is a sufficient basis for standing"); *United States v. Richardson*, 418 U. S. 166, 177 (1974) ("genuine interest" alone cannot satisfy the "particular concrete injury" requirement). (Slip Op. at 3).

The Whittington-Evans Dkt. 8-14 and Rogers Dkt. 8-15 Declarations that accompanied Appellant's Motion for a Preliminary Injunction in the District Court are cases in point. They both argue that the planned 18.9-mile road "through the Refuge is incompatible with the Refuge. But that road has been vacated by the Land Exchange litigation and thus does not qualify for an injunction pending appeal because no action is "imminent." They both argue that "Constructing the KCC segment will make illegal ATV encroachment into these lands easier. The KCC segment alone will likely increase ATV use on the adjacent federal lands." Whittington-Evans Dkt. 8-14 at ¶ 46; Rogers Dkt. 8-15 to the same effect ¶ 26.

But the District Court accepted the point made in the Lowell Declaration Dkt. 31-1 at ¶¶ 5-7 that the construction area would be closed to the public for safety reasons during the construction period and thus no ATV traffic would be on the KCC 2.8-mile segment (which no longer includes a bridge or traffic over a bridge toward the Wilderness boundary). The District Court found that the harms alleged were simply too speculative:

> DOW reverts to the irreparable harm argument from its initial preliminary injunction motion. (Dkt. 27 at 7) It argues that starting construction will increase harmful off-road vehicle use on adjacent Refuge and Wilderness land. (Dkt. 27 at 7; Dkt. 8 at 28) But DOW provided no evidence showing that in the next 25 days, "extending the existing road closer to the refuge wilderness boundary" will facilitate

> additional unlawful ATV use. (Dkt. 27 at 7) Nor has it shown that construction further from the edge of Refuge and Wilderness lands will increase unlawful ATV use. (Dkt. 27 at 7) In other words, DOW's argument is based purely on speculation that new construction will induce third-parties to start breaking the law. Such speculation does not warrant an injunction.
>
> Indeed, construction may reduce unlawful activity. As Alaska explained, starting construction will trigger the use of safety measures, like barricades, that are specifically designed "to prevent unauthorized access" to areas near the construction zone. (Dkt. 31-1 at 3-4) These may or may not affect unlawful access that is allegedly happening already. But DOW offered no evidence for its counterintuitive position that people will immediately flock to an active construction site, run by the State, to start breaking the law. The harms alleged by DOW thus are too speculative.

Dkt. 34 Case No. 3-26-cv-00298 ACP at pages 3-4.

This is like the situation in *Summers v. Earth Island Institute*, 555 U.S. 488, 495-496 (2009) in which Justice Scalia, writing for the Court, determined that an allegation that the Plaintiff would suffer future harm from a Forest Service regulation because it had suffered harm in the past from a Forest Service regulation "relates to past injury rather than imminent future injury that is sought to be enjoined." *Id.* at 495.

In short, Appellant will suffer no injury during the period of construction on KCC private land in 2026 (or even thereafter). There is no imminent or concrete injury that Appellant or its members will sustain sufficient to confer standing or justify imposition of an injunction pending appeal. Appellant and its members are simply distressed by the possibility that the 2.8-mile road built on KCC land may be

part of a future longer road. As in *Summers* its claim about future ATV use in and around KCC land is based upon its concerns about potential future impacts from ATV use on the 18.9-mile road that has been vacated. It does not account for, or give credence to, the State's goal that "one objective of the project is to consolidate travel onto a stable route." Dkt. 17-8 at pages 5-6.[13] As in the *National Trust For Historic Preservation* case and *Summers* Appellant does not have Article III standing.

Finally, because traditional ATV use for subsistence purposes by local rural residents is allowed in National Wildlife Refuge Wilderness Areas in Alaska by ANILCA § 811 and 50 C.F.R.§ 36.12 (a), prohibiting the 2.8-mile road on KCC private land will not redress the harm that will be unleashed on the Refuge and Wilderness as a consequence of the 2.8-mile road that Appellant claims it will suffer.

### D. The Balance of Hardship Does Not Tip Toward Appellant.

1. Balance of Hardships as Determined by the Court.

---

[13] "The State intends to use the subsistence access re-route to reduce the number of tertiary trails in the region by consolidating ORV use onto a modern roadbed, designed and constructed to comply with all environmental laws; to provide King Cove residents a more direct and easier alternate pathway, thereby reducing the dispersed impact of tertiary travel.

AKDOT has successful experience from the design and construction of a similar centralized pathway to concentrate ORV use in its evacuation road construction in Gambell, Alaska."

See Dkt. 17 at page 11.

Plaintiff seeks a "limited injunction" of 21 days from when it will arrive in the Ninth Circuit September 8, 2026. Dkt. 27 at 9. Plaintiff attempts to characterize this as "minimizing the impacts of delay on Defendants' interests should the appellate court decline to grant emergency relief pending appeal." *Id.* This is not the case because by the end of September-mid October it is highly likely that weather conditions in King Cove will adversely impact the opportunity to proceed with construction. (Kochuten Declaration at ¶ 19). Accordingly, a so-called "limited injunction" will delay construction until at least the next operating season and is thus the functional equivalent of a preliminary injunction request until the 2027 operating season. If an injunction is granted Appellant should thus be required to put up a bond.

Such an over-winter delay will visit a considerable monetary loss to the State and to the contractor which mobilized equipment to King Cove to begin construction. As the District Court observes Appellant did not challenge the KCC 2.8-mile segment until "after the final [Compatibility] determination issued." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 20.

The District Court also points out the benefits of proceeding without an injunction: 1) "near-term subsistence benefit from the segment itself;" and 2) "construction across KCC property may improve lawful access to existing subsistence areas." Order Dkt. 24 at page 20. (As the Court says: "Better access to subsistence hunting and fishing areas, especially in rural Alaska where subsistence

is a way of life, is important." Order Dkt. 24 Case No. 3-26-cv-00298 ACP at page 21).

The District Court sums up the Balance of Hardships as follows:

> That leaves some *potential* environmental degradation on one side and, on the other, a concrete multimillion-dollar construction loss together with some subsistence-access benefit. The balance does not tip toward DOW even assuming they raised a sufficiently strong argument on the merits. This is particularly true when AKDOT has committed to leaving wetlands on the road's path undisturbed and other measures to minimize potential environmental harm. (Dkt. 17-2 at 2-3; Dkt. 17-15)
>
> That independently defeats relief. *Id.* (Emphasis the District Court's).

2. The Balance of Hardships Favors KCC.

KCC certainly agrees with and appreciates the Balance of Hardships as determined by the District Court. But there are additional hardships caused to KCC by the 60-year delay that are best expressed by Chantae Kochuten, KCC's CEO:

1. ANCSA and ANILCA are unique statutes that recognize that that Alaska Native land claims should conform "with the real economic and social needs of Natives and "with maximum participation by Natives in decisions affecting their rights and property," The years of delay in the constructing the King Cove – Cold Bay Road has prevented these goals from being fully achieved by the rural residents of King Cove. (Section 2 of ANCSA). Kochuten Declaration at ¶ 15.

2. "For generations, our people have endured isolation, dangerous travel conditions, and barriers to accessing essential services. One of KCC's highest priorities is providing safe, reliable, and affordable access between King Cove and the Cold Bay Airport, Alaska's fourth-longest paved, all-weather runway. For our shareholders, this is not a matter of convenience. IT is a matter of safety, opportunity, and dignity. Kochuten Declaration at ¶ 6.

3. "I am Aleut. The lands at issue in this case are not merely parcels on a map to me or to the shareholders I represent. They are part of our identity, our history, and our survival as a people. Based on traditional knowledge passed down through generations and local knowledge shared within our community, my ancestors occupied and used these lands for subsistence hunting, fishing, gathering, and travel for thousands of years. They established trails and subsistence cabins connecting King Cove and Cold Bay long before federal designations, before military occupation during World War II, before wildlife refuge boundaries were drawn, and before KCC received title to its lands under ANCSA. Those historic connections to the land have never disappeared. Our people continue to depend on them today." Kochuten Declaration at ¶ 14.
4. ANILCA Section 101 (b) makes protection of subsistence resources a purpose of ANILCA and ANILCA Section 101 (c) makes "provid[ing] the opportunity for rural residents engaged in a subsistence way of life to continue to do so" a purpose of ANILCA. So, why are there barriers to constructing a 2.8-mile road on KCC's private land to better access subsistence resources? This should be considered in balancing the equities. Kochuten Declaration at ¶ 16.

5. Even the United Nations recognizes the rights of Native self-reliance. Article 7 of the United Nations Declaration on the Rights of Indigenous Peoples states, "Indigenous peoples have the collective right to live in freedom, peace and security as distinct peoples." Kochuten Declaration at ¶ 17.

6. As CEO of KCC, I see firsthand the frustration, disappointment, and exhaustion felt by our shareholders after decades of waiting for a solution. I also see their determination. This project is not simply about a road. It is about the ability of an Alaska Native community to remain connected to one another, to access subsistence resources, to preserve a way of life, and to exercise rights promised under federal law. Our shareholders have waited generations for meaningful progress. They deserve the same safety, access, and opportunity that most Americans take for granted. Kochuten Declaration at ¶ 21.

KCC requests that these points also be considered in balancing the hardships.

## CONCLUSION

For the foregoing reasons KCC respectfully requests that Appellant's Motion for Injunction Pending Appeal be denied.

Dated this 10th day of September 2026

*/s/ James F. Clark*
James F. Clark
LAW OFFICE OF JAMES F. CLARK
1109 C Street
Juneau, AK 99801
(907) 723-6952 (office)
jfclarkiii@gmail.com
Alaska Bar #6907025

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

**I HEREBY CERTIFY** that this document contains 6,608 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)

Date: September 10, 2026

/s/ James F. Clark
James F. Clark
Law Office of James F. Clark
1109 C Street
Juneau, AK 99801
(907) 723-6952 (cellphone)
jfclarkiii@gmail.com
Ak Bar # 6907025
Attorney for KCC

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 10, 2026, a copy of King Cove Corporation's Opposition to Plaintiff's Motion for an Injunction Pending Appeal was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*/s/ James F. Clark*
James F. Clark
LAW OFFICE OF JAMES F. CLARK
1109 C Street
Juneau, AK 99801
(907) 723-6952 (office)
jfclarkiii@gmail.com
Alaska Bar #6907025

# EXHIBIT 1

CORI MILLS
ACTING ATTORNEY GENERAL
Maria Teresa Davenport, Alaska Bar No. 2511140
Assistant Attorney General
State of Alaska, Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: 907-269-5165
Facsimile: 907-276-3697
Email: terri.davenport@alaska.gov

*Attorney for Rule 19 Defendant Commissioner Anderson*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff,<br><br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; and BRIAN NESVIK, in his official capacity as the Director of the U.S. Fish and Wildlife Service,<br><br>Defendants,<br><br>and<br><br>KING COVE CORPORATION, an Alaska Native Village Corporation; and RYAN ANDERSON, in his official capacity as the Commissioner of the Alaska Department of Transportation and Public Facilities,<br><br>Rule 19 Defendants. | **DECLARATION OF DAVID H. LOWELL IN SUPPORT OF COMMISSIONER ANDERSON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION PENDING APPEAL**<br><br>**Case No. 3:26-cv-00298-ACP** |

## DECLARATION OF DAVID H. LOWELL

I, David H. Lowell, declare under penalty of perjury that the following is true:

1. I am employed by the State of Alaska, Department of Transportation and Public Facilities ("DOT&PF"), as the Construction Engineer for the Southcoast Region. I oversee DOT&PF's construction administration for the King Cove to Cold Bay Road project ("Project"). In that role, I am responsible for ensuring that construction is performed within authorized limits and applicable permit conditions and in compliance with the State of Alaska's contractual and environmental commitments.

2. I make this declaration based on my personal knowledge, my review of the Project plans and permit figures, and my responsibilities for construction administration. I could competently testify to these facts if called upon to do so.

3. Construction of the first 2.8 miles of the Project (the "KCC Segment") commenced on September 1, 2026, and heavy equipment is already mobilized in King Cove for construction purposes.

4. Construction of the KCC Segment is performed in conformance with Section 643 of the Standard Specifications for Highway Construction, the Alaska Traffic Manual and the Manual on Uniform Traffic Control Devices ("MUTCD"). Alaska's road construction specifications require that contractors furnish, erect, maintain, and replace traffic-control devices necessary to ensure public safety, including barricades, signs, barriers, fencing, and other measures used to direct traffic through or around construction zones.

5. Alaska's specifications further contemplate roadway closures and require the use of traffic-control devices to implement and maintain those closures. Once processing and hauling

operations for this construction commence, the existing 17.5 mile road from King Cove is permitted for public closure starting at milepost 9.5.

6. Under MUTCD-based traffic-control standards, roadway closures are implemented through physical closure devices, including Type III barricades—the largest of the standard barricade types—and other measures designed to prevent unauthorized entry or public use of closed construction areas.

7. With respect to the KCC Segment construction, barricades will be employed at the end of each shift to prevent unauthorized access while under construction.

8. Under normal seasonal conditions, the viable construction season in King Cove typically ends in late November, as winter construction is infeasible because it is difficult, expensive, and dangerous. The schedule for the KCC Segment of the Project is on a critical path with zero total float, meaning that any meaningful delay in that portion of the Project—no matter how minor—likely would push critical activities and segment completion beyond the viable seasonal window.

9. The roughly one-month injunction requested by Plaintiff—25 days from September 4, 2026—would substantially delay the Project and certainly push completion of the KCC Segment beyond the viable seasonal window, requiring construction of that segment to restart in April 2027.

10. Because the heavy construction equipment already in King Cove would again be required in April 2027, the State of Alaska would have to demobilize the equipment for use on

other projects before re-mobilizing it for the 2027 construction season or be responsible for paying daily stand-by rates for the mobilized equipment.

11. The combined mobilization and demobilization costs incurred from noncompletion of the KCC Segment during the 2026 construction season are expected to be $5,903,687.

12. Although keeping the heavy equipment in King Cove during the winter and paying stand-by costs while the equipment sits idle would be the lower cost option, the financial significance of this arrangement still would be substantial. Maintaining stand-by for the 25 days of September as requested by Plaintiff would cost the State of Alaska roughly $276,000. The stand-by costs for the winter (from December 2026 through March 2027) would cost approximately $1,324,920. In the aggregate, the State of Alaska would be responsible for roughly $1,600,920 in stand-by costs if this Court ordered an injunction pending appeal.

Executed this 3rd day of September 2026, in Juneau, Alaska.

By: David Lowell Digitally signed by David Lowell Date: 2026.09.03 09:05:48 -08'00'

David H. Lowell
Construction Engineer
Southcoast Region
Alaska Department of Transportation
& Public Facilities

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746.

James F. Clark
Law Office of James F. Clark
1109 C Street
Juneau, AK 99801
ABA No.6907025
(907) 723-6952
jfclarkiii@gmail.com
Attorney for Defendant—Intervenors

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 3:26-cv-00298-ACP |
| U.S. ARMY CORPS OF ENGINEERS, et al., | ) | |
| Defendants, | ) | |
| v. | ) | |
| KING COVE CORPORATION, and CITY OF KING COVE | ) | |
| Proposed Defendant-Intervenors | ) | |

**DECLARATION OF CHANTAE KOCHUTEN**

Under penalty of perjury I, Chantae Kochuten, state and declare the following:

1. My name is Chantae Kochuten. I am the Chief Executive Officer (CEO) of the King Cove Native Corporation, (hereinafter KCC). I was voted CEO by the KCC board KCC in February 2024. I have served as CEO of KCC since then.

2. KCC is an Alaska Native Village Corporation formed pursuant to the Alaska Native Claims Settlement Act of 1971 (hereinafter ANCSA). KCC is the village corporation for the Aleut people of the King Cove area of the Aleutians East Region which is located near the end of the Alaska Peninsula.

3. ANCSA required that every certified Alaska Native village by the Bureau of Indian Affairs organize as a "for profit" or nonprofit corporation under Alaska State law and that each original shareholder receive 100 shares of stock in KCC. KCC was formed under Alaska law on September 12, 1972, as a for profit corporation.

4. Each original shareholder received 100 shares of stock. Only original shareholders, like my grandparents and their family members and descendants can hold stock except in specific circumstances. So KCC is essentially a closely held corporation with its duties directly related to the good of its almost entirely Aleut/King Cove shareholders.

5. In 1990, the United States issued patent 50-90-0653 to the King Cove Corporation (KCC) that included a conveyance of lands within the boundaries of the Izembek Refuge within sections 6, 7, 8 and 17 of Township 57 South, Range 87 West, which were identified in the patent as lands within the Izembek National Wildlife Refuge. KCC's land entitlement consisted of three townships, totaling 69,320 acres in the core township and other lands around King Cove.

6. Although KCC is a for-profit corporation, its mission extends far beyond business. Our responsibility is to the people who own this corporation: the Aleut families of King Cove and their descendants. Every share represents a connection to this community, its history, and its future. For generations, our people have endured isolation, dangerous travel conditions, and barriers to accessing essential services. One of KCC's highest priorities is providing safe, reliable, and affordable access between King Cove and the Cold Bay Airport, Alaska's fourth-longest paved, all-weather runway. For our shareholders, this is not a matter of convenience. IT is a matter of safety, opportunity, and dignity.

7. As CEO of KCC, I am responsible for protecting and advancing the interests of our shareholders. In October 2025, with the full authorization and support of the KCC Board of Directors, I executed a land exchange agreement with the Department of the Interior. Through this agreement, KCC agreed to relinquish a portion of its ancestral lands in exchange for an 18.9-mile transportation corridor connecting King Cove and Cold Bay. This was not a decision made lightly. The land involved carries cultural, historical, and personal significance for our people. We agreed to exchange because we believed it offered a long-awaited solution to a transportation crisis that has affected our community for decades.

8. KCC's management and our shareholders remain unwavering in our commitment to this land exchange. The Court's August 18, 2026 decision vacating the exchange was devastating to many in our community. For decades, our people have waited, negotiated, compromised, and sacrificed in pursuit of a reliable transportation link. Many shareholders believed we were finally moving toward a solution. The decision has left many feeling discouraged, unheard, and once again forced to watch a critical opportunity slip away.

9. As I understand it, the Court's vacation of the Land Exchange did not impact 2.8 miles of that portion of the road planned for construction this Fall starting September 1st which is on land that KCC obtained pursuant to ANCSA in the 1970s and that does not impact wetlands (hereinafter "KCC private land").

10. This 2.8-mile road planned to be constructed on KCC private land to the proposed parking area is important to KCC because it will increase access to subsistence resources needed by our shareholders and citizens of King Cove and consolidate ATV traffic within land that has been patented to KCC since 1990. Plaintiff and its members do not use or have any rights to KCC's private land on which the 2.8-mile road is planned to be constructed.

11. The 2.8-mile road planned to be constructed on KCC private land to the proposed parking area is subject to an ANCSA 22(g) patent restriction. It was determined to be compatible with the purposes of the Refuge, and thus the Refuge Manager was obligated to issue a CD.

12. A major purpose of the 2.8-mile road planned for construction on KCC's land is to improve access to subsistence resources and to consolidate All Terrain Vehicle (ATV) traffic to that road.

13. KCC's management and shareholders are deeply troubled by the assertion that the proposed 2.8-mile road on KCC's own private land is somehow incompatible with the purposes of the Izembek Refuge. To many of us, this argument ignores the reality that Alaska Native peoples lived, traveled, hunted, gathered, and cared for these lands for countless generations before the refuge existed. It is painful to hear our traditional use of our own homeland characterized as inconsistent with conservation when our ancestors sustained these resources for thousands of years.

14. I am Aleut. The lands at issue in this case are not merely parcels on a map to me or to the shareholders I represent. They are part of our identity, our history, and our survival as a people. Based on traditional knowledge passed down through generations and local knowledge shared within our community, my ancestors occupied and used these lands for subsistence hunting, fishing, gathering, and travel for thousands of years. They established trails and subsistence cabins connecting King Cove and Cold Bay long before federal designations, before military occupation during World War II, before wildlife refuge boundaries were drawn, and before KCC received title to its lands under ANCSA. Those historic connections to the land have never disappeared. Our people continue to depend on them today.

15. Congress enacted ANCSA with the understanding that Alaska Native people should have meaningful participation in decisions affecting their lands, rights, and futures. Section 2 of ANSCA provides that Alaska Native land claims should conform "with the real economic and social needs of Natives and "with maximum participation by Natives in decisions affecting their rights and property," Yet the decades-long delays surrounding the King Cove-Cold Bay connection have left many shareholders feeling their voices, concerns, and lived experiences have been repeatedly set aside and ultimately the goals of ANCSA from being fully achieved.

16. ANILCA Section 101 (b) makes protection of subsistence resources a purpose of ANILCA and ANILCA Section 101 (c) makes "provid[ing] the opportunity for rural residents engaged in a subsistence way of life  to continue to do so" a purpose of ANILCA.

17. Article 7 of the United Nations Declaration on the Rights of Indigenous Peoples states, "Indigenous peoples have the collective right to live in freedom, peace and security as distinct peoples."

18. So, perhaps a compatibility determination should determine whether the Refuge is compatible with the rights and protections the law affords Alaska Native people under ANCSA and ANILCA and the United Nations Declaration on the Rights of Indigenous Peoples.

19. Time is not an abstract concern for our community. By late September in most years, weather conditions in King Cove frequently deteriorate to the point that it becomes a barrier to air travel and will adversely impact the opportunity to proceed with construction. Each delay

20. The continued delay or permanent loss of a road connection between King Cove and Cold Bay would have profound consequences for KCC shareholders and the broader King Cove community. It would maintain a barrier that has separated families, limited opportunities, and restricted access to resources and services available elsewhere. Most Americans can get into a vehicle and drive to visit loved ones, access medical services, or reach transportation hubs. The people of King Cove don't have that same opportunity. The road represents more than transportation. It represents connection, self-determination, and the ability to participate more fully in everyday life alongside our neighbors in Cold Bay. Delay or loss of a road connecting King Cove to Cold Bay would be a continuing barrier to more communication between the citizens of King Cove and KCC shareholders with Cold Bay.

21. As CEO of KCC, I see firsthand the frustration, disappointment, and exhaustion felt by our shareholders after decades of waiting for a solution. I also see their determination. This project is not simply about a road. It is about the ability of an Alaska Native community to remain connected to one another, to access subsistence resources, to preserve a way of life, and to exercise rights promised under federal law. Our shareholders have waited generations for meaningful progress. They deserve the same safety, access, and opportunity that most Americans take for granted.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted on this 3rd day of September 2026.

Chantae Kochuten, CEO of King Cove Corporation